# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF WISCONSIN

**UNITED STATES OF AMERICA,**

    Plaintiff,

  v.                                                                         Case No. 16-CR-146

**TERRELL L. WINTERS,**

    Defendant.

## SUPPLEMENT TO RECOMMENDATION ON
## DEFENDANT'S MOTION TO SUPPRESS

On May 7, 2016, five Milwaukee police officers were patrolling on bicycles when they heard a gun drop in the street. The officers observed two individuals, Robi Tyus and Terrell L. Winters, standing in the street near the dropped gun. Mr. Tyus picked up the gun, crossed the street, and claimed he had a permit to carry the firearm. As the officers approached, Mr. Winters took several steps toward the sidewalk, walking in between two parked cars. Officer Sarah Beland rode on the sidewalk and stopped her bike in front of Mr. Winters. She directed Mr. Winters to stop after observing a bulge on the right side of his jacket; he complied. When Mr. Winters took a few additional steps forward, Officer Gerald Kulwich grabbed him from behind. Mr. Winters was handcuffed, and officers recovered a firearm from his jacket pocket. He was subsequently indicted for being a felon in possession of a firearm.

Mr. Winters moved to suppress the seized firearm, arguing that officers violated his Fourth Amendment rights when they stopped and frisked him without the requisite level of suspicion. After an evidentiary hearing, this Court issued a report recommending that Mr. Winters's suppression motion be denied. Specifically, the Court determined that Mr. Winters was seized within the meaning of the Fourth Amendment when Officer Beland told him to stop, that Officer Beland had reasonable suspicion to stop and frisk Mr. Winters, and that Officer Kulwich did not exceed the scope of the stop when he grabbed Mr. Winters from behind. The Court further determined that the government would not have inevitably discovered the firearm.

Mr. Winters objected to the report and recommendation, arguing (for the first time) that he was seized when Officer Beland stopped her bike in his path. United States District Judge J.P. Stadtmueller remanded the matter to this Court to address the seizure timing issue and to submit a supplemental report and recommendation on that issue. On remand, the Court conducted another evidentiary hearing, and the parties submitted post-hearing briefs. For the following reasons, the Court finds that Mr. Winters was seized upon submitting to Officer Beland's first verbal communication, whatever words she used. Based on the testimony provided at the hearings, however, the Court finds that law enforcement officers lacked reasonable suspicion to seize Mr. Winters at that time. The Court therefore will vacate its initial report and recommendation and will now recommend that Mr. Winters's motion be granted.

## I. Factual Background

The Court provided a detailed recitation of the facts in its initial report and recommendation. *See* Recommendation on Defendant's Motion to Suppress 2–5, ECF No. 23. The Court summarizes those facts here, supplementing where necessary based on evidence received at the second evidentiary hearing.

On May 7, 2016, Officers Kulwich and Beland were on bicycle patrol in the City of Milwaukee with three other officers (Nathan Povlick, Austin Richards, and Bradley Nickel), patrolling northbound in the 2400 block of North 44th Street. *See* Transcript of Evidentiary and Detention Hearing 22–23, ECF No. 28; Transcript of Supplemental Evidentiary Hearing 8–9, ECF No. 38. At 6:09 p.m. (still daylight at that time of year), the officers heard an object, which they believed to be a firearm, drop in the street. Hr'g Tr. 22–23, 29; Suppl. Hr'g Tr. 8–9. Officers observed two individuals, later identified as Robi Tyus and Terrell Winters, standing next to two parked cars on the west side of the street near the dropped object. Hr'g Tr. 23; *see also* Exhibit 1002, "Subj Stop" at 0:00–0:05. Mr. Tyus picked up the dropped firearm, crossed the street, told the officers that he had a concealed carry weapon permit, and immediately provided his documentation. Hr'g Tr. 23; Ex. 1002, "Subj Stop" at 0:00–0:05. He was never charged with a crime for his conduct. Hr'g Tr. 12.

While Mr. Tyus was crossing the street, Mr. Winters began walking westbound in between the parked cars. Ex. 1002, "Subj Stop" at 0:03–0:09. Officer Beland rode her bike on the west sidewalk, meeting Mr. Winters just as he stepped onto the curb of the street. Suppl. Hr'g Tr. 13–14, 17–18, 25, 46. Officer Beland

3

positioned herself on the sidewalk in front and slightly to the left of Mr. Winters. Hr'g Tr. 60–61; Suppl. Hr'g Tr. 18–19. While still on her bike, Officer Beland observed a bulge on the right side of Mr. Winters's jacket. Hr'g Tr. 60–61; Suppl. Hr'g Tr. 15–16, 26. The right side of the jacket also appeared weighted down as compared to the left side of the jacket. Based on this observation and her training and experience, Officer Beland believed that Mr. Winters had a gun in his right jacket pocket. Hr'g Tr. 61.

After observing the bulge, Officer Beland communicated to Mr. Winters to remain where he was. Hr'g Tr. 62, 73; Suppl. Hr'g Tr. 17. Mr. Winters stopped and stood on the curb. Hr'g Tr. 71. When he took three baby steps forward, Officer Kulwich ran and grabbed him from behind. *See* Exhibit 1, FI-5 at 0:01–3:02. Officers Beland and Povlick helped Officer Kulwich gain control of Mr. Winters. He was then handcuffed, and officers recovered a handgun from his front-right jacket pocket and cocaine, marijuana, and cash from his front-left chest pocket. Mr. Winters was placed in a squad car and conveyed to the district police station. Hr'g Tr. 29, 32–33.

## II. Procedural Background

On September 13, 2016, a federal grand jury indicted Mr. Winters for one count of knowingly possessing a firearm as a prohibited person, in violation of 18 U.S.C. § 922(g)(1). *See* Indictment, ECF No. 1. On November 17, 2016, Mr. Winters moved to suppress all evidence obtained as a result of his seizure by law enforcement officers on May 7, 2016. *See* Defendant's Motion to Suppress Evidence

4

and Request for Evidentiary Hearing, ECF No. 14. The Court held an evidentiary hearing on December 1, 2016, and heard testimony from Mr. Tyus and Officers Kulwich and Beland. *See* Hr'g Tr. During the evidentiary hearing, the Court received into evidence the body-camera recordings from Officers Nickel, Povlick, and Kulwich. *See* Ex. 1. The Court also received into evidence a copy of the Milwaukee Police Department's standard operating procedure manual for body-worn cameras, *see* Exhibit 1000, and a copy of Officer Kulwich's police report concerning the incident, *see* Exhibit 1001. The Court heard oral argument from the parties on December 2, 2016.

On December 6, 2016, the Court issued a report recommending that Judge Stadtmueller deny Mr. Winter's suppression motion. *See* R & R. Mr. Winters timely objected to the report and recommendation, arguing that Officer Beland seized him when she stopped her bike in his path, that officers did not have reasonable suspicion to stop him, that officers did not have reasonable suspicion to believe that he was armed and dangerous, that Officer Kulwich's conduct transformed the stop into an arrest requiring probable cause, and that this Court erred in crediting the officers' testimony despite the contradictory body-cam footage. *See* Defendant's Objections to Magistrate Judge's Report and Recommendation, ECF No. 25.

On December 20, 2016, Judge Stadtmueller issued an order vacating Mr. Winters's trial date and remanding the matter to this Court. *See* Order, ECF No. 30. Judge Stadtmueller noted that Mr. Winters had argued before this Court that he was seized when Officer Beland told him to stop, not at any point prior thereto.

5

Because "the timing of seizure is critical and potentially dispositive," however, Judge Stadtmueller remanded the matter "for an explicit finding on the issue of whether seizure occurred before Beland gave Winters the stop command." *Id.* at 2. Judge Stadtmueller left it to this Court's discretion whether to conduct any further hearings or request further briefing from the parties. *Id.* at 3. He requested this Court to then issue a supplemental report and recommendation on the seizure timing issue.

The Court held a supplemental evidentiary hearing on February 1, 2017, and heard additional testimony from Officer Beland. *See* Suppl. Hr'g Tr. During the supplemental hearing, the Court received into evidence the body-camera recordings from Officers Povlick and Richards. *See* Ex. 1002. The parties subsequently submitted post-hearing briefs, *see* Defendant's Brief in Support of Motion to Suppress, ECF No. 40; Government's Response, ECF No. 42; Defendant's Reply, ECF No. 43, and, thus, the matter is ready for disposition.

### III. Discussion

Mr. Winters argues that he was seized when Officer Beland pulled onto the sidewalk and stopped her bike in his path and that this seizure was not supported by reasonable suspicion. The Court will address each argument in turn.

**A. When was Mr. Winters seized?**

For purposes of the Fourth Amendment, "[a] seizure may be effected in either of two ways: 'through physical force . . . [or] through a show of authority *and* submission to the assertion of authority.'" *United States v. Mays*, 819 F.3d 951, 955–

56 (7th Cir. 2016) (quoting *United States v. Griffin*, 652 F.3d 793, 798 (7th Cir. 2011)). "[T]he crucial test is whether, taking into account all of the circumstances surrounding the encounter, the police conduct would 'have communicated to a reasonable person that he was not at liberty to ignore the police presence and go about his business.'" *Florida v. Bostick*, 501 U.S. 429, 437 (1991) (quoting *Michigan v. Chesternut*, 486 U.S. 567, 569 (1988)).

"[W]hat constitutes a restraint on liberty prompting a person to conclude that he is not free to 'leave' will vary, not only with the particular police conduct at issue, but also with the setting in which the conduct occurs." *Chesternut*, 486 U.S. at 573. "Circumstances that suggest a seizure include 'the threatening presence of several officers, display of their weapons, physical touching of the private citizen, use of forceful language or tone of voice (indicating that compliance with the officers' request might be compelled), and the location in which the encounter takes place.'" *United States v. Smith*, 794 F.3d 681, 684 (7th Cir. 2015) (quoting *United States v. Clements*, 522 F.3d 790, 794 (7th Cir. 2008)). Other factors include

> whether police made statements to the citizen intimating that he or she was a suspect of a crime, whether the citizen's freedom of movement was intruded upon in some way, whether the encounter occurred in a public or private place, and whether the officers informed the suspect that he or she was free to leave.

*Smith*, 794 F.3d at 684 (citations omitted). "These factors . . . are neither exhaustive nor exclusive." *Smith*, 794 F.3d at 684.

Based on evidence developed at the supplemental hearing, particularly the admission of body-cam footage from Officer Richards, the Court finds that Mr.

7

Winters was not seized when Officer Beland stopped her bike in his path. As the officers approached, Officer Beland was riding her bike on the west sidewalk, and the other four officers were riding in the street. Suppl. Hr'g Tr. 11–14, 33–34, 52. When Officer Beland stopped her bike, Mr. Winters had just walked between two parked cars and stepped onto the west-side curb. Suppl. Hr'g Tr. 17. Officer Kulwich was on his bike several feet behind Mr. Winters, Officer Povlick was on his bike just beyond the southernmost parked car, and Officers Richards and Nickel were on their bikes on the east side of the street near Mr. Tyus. *See* Exs. 1 & 1002; *see also* Suppl. Hr'g Tr. 11–13, 19–24.

The body-camera recordings clearly show that the other officers were focused on Mr. Tyus. Officer Kulwich turned his attention to Mr. Winters only after he became argumentative, and Officers Povlick and Nickel assisted in apprehending Mr. Winters after Officer Kulwich grabbed him from behind.[1] Thus, although the incident involved a significant show of force—five uniformed police officers approaching on bikes—the display of force was aimed almost entirely on Mr. Tyus, not Mr. Winters.

A reasonable person in Mr. Winters's position would not believe he was impeded from leaving solely because Officer Beland stopped her bike in his path. The incident occurred on a public street during daylight hours, and Officer Beland did not display her weapon, use forceful language, or inform Mr. Winters that he was a suspect of a crime. The facts of this case are therefore distinguishable from

---

[1] Officer Richards remained with Mr. Tyus during the entire incident. *See* Ex. 1002, "Subj Stop."

the facts in *Smith*, where the Seventh Circuit determined that a seizure occurred when two officers patrolling on bicycles approached an individual in a dark alley, physically obstructed his freedom of movement, and posed a single, accusatory question. *See Smith*, 794 F.3d at 684–85. Although Officer Beland's positioning of her bike impeded Mr. Winters's path to the southwest, this factor alone would not communicate to a reasonable person that he was not free to continue walking in any other direction.

So when was Mr. Winters seized? The Court concludes that Mr. Winters was seized upon submitting to Officer Beland's first verbal communication. Officer Beland provided several different answers regarding her first contact with Mr. Winters. At the first evidentiary hearing, she testified on direct-examination that she asked Mr. Winters if he had a firearm and a CCW permit before she asked him to stop. Hr'g Tr. 60–62. She told the Court, however, that her first words to Mr. Winters were, "Stop." Hr'g Tr. 73. At the supplemental evidentiary hearing, Officer Beland testified that she said "Hey dude" (or something to that effect) before she ordered Mr. Winters to stop. Suppl. Hr. Tr. 15–17, 40–41, 58–60. Regardless of Officer Beland's specific word choice, it is clear that she was directing Mr. Winters to remain where he was, and he complied with this command.[2] A reasonable person in Mr. Winters's position would not have felt free to leave at that point. Indeed, at

---

[2] The government argues that Officer Beland's "'stop' command did not constitute a seizure because Winters kept moving." Govt.'s Resp. 2. The Court disagrees. Mr. Winters unquestionably stopped when Officer Beland told him to remain where he was. Hr'g Tr. 71. The three baby steps he later took did not alter his submission. *See* Ex. 1, FI-5 at 0:02–0:13. As Mr. Winters aptly noted, "submission does not require that a citizen become a mannequin." Def.'s Reply 1.

9

the first evidentiary hearing, Officer Beland testified that Mr. Winters would have been hindering an investigation if he had kept walking after her first verbal communication to him. Hr'g Tr. 73.

**B. Was Mr. Winters's seizure supported by reasonable suspicion?**

The Fourth Amendment protects against "unreasonable searches and seizures." U.S. Const. amend. IV. A seizure generally is "reasonable" only if it is based on probable cause to believe the individual has committed a crime. *See United States v. Howard*, 729 F.3d 655, 659 (7th Cir. 2013) (citing *Bailey v. United States*, 133 S. Ct. 1031, 1037 (2013)). Pursuant the well-recognized exception under *Terry v. Ohio*, however, law enforcement officers may briefly stop an individual for investigatory purposes if the "officer has a reasonable suspicion . . . that criminal activity may be afoot." *United States v. Patton*, 705 F.3d 734, 737 (7th Cir. 2013) (citing *Terry v. Ohio*, 392 U.S. 1, 21–22 (1968)). "Such a brief detention is permitted when it demands only a limited intrusion into an individual's privacy and rests on 'specific and articulable facts which, taken together with rational inferences from those facts, reasonably warrant that intrusion.'" *Matz v. Klotka*, 769 F.3d 517, 522 (7th Cir. 2014) (quoting *Terry*, 392 U.S. at 21).

"While 'reasonable suspicion' is a less demanding standard than probable cause and requires a showing considerably less than preponderance of the evidence, the Fourth Amendment requires at least a minimal level of objective justification for making the stop." *Illinois v. Wardlow*, 528 U.S. 119, 123 (2000) (citing *United States v. Sokolow*, 490 U.S. 1, 7 (1989)). "In other words, reasonable suspicion is less

than probable cause but more than a hunch." *United States v. Lawshea*, 461 F.3d 857, 859 (7th Cir. 2006) (citing *United States v. Lenoir*, 318 F.3d 725, 729 (7th Cir. 2003)). In determining whether a stop is supported by reasonable suspicion, courts "must examine the totality of the circumstances in the situation at hand, in light of the individual officers' own training and experience, and should uphold the stop if it finds that 'the detaining officer ha[d] a particularized and objective basis for suspecting legal wrongdoing.'" *United States v. Williams*, 731 F.3d 678, 683–84 (7th Cir. 2013) (citing *United States v. Arvizu*, 534 U.S. 266, 273 (2002)).

In its initial report and recommendation, this Court determined that officers had reasonable suspicion to stop and frisk Mr. Winters. *See* R & R 10–16. That finding was based largely on Officer Beland's testimony that, before she ordered Mr. Winters to stop, she observed a large bulge on the right side of his jacket and that the jacket was weighted down on the right side. The same is true today. Although the particular words she used has shifted from time to time, Officer Beland has consistently stated that she observed the bulge *prior to* directing Mr. Winters to stop and remain on top of the curb.[3] *See* Hr'g Tr. 40, 60–61; Suppl. Hr'g Tr. 58–59. Officer Beland was standing only a few feet away from Mr. Winters, in clear daylight conditions, when she made this observation, and Mr. Winters's right side was facing her. Hr'g Tr. 72–73; Suppl. Hr'g Tr. 18–19, 26, 46–47, 60; *see also* Ex. 1,

---

[3] To be sure, the sequence of events occurred rapidly; Officer Beland directed Mr. Winters to stop within seconds after stopping her bike in his path.

11

FI-5 at 0:02–0:09; Ex. 1002, "Subj Stop" at 0:50–0:52. Officer Beland therefore reasonably believed that Mr. Winters had a firearm in his front-right jacket pocket.[4]

At the time Mr. Winters was seized, however, Officer Beland did not have reasonable suspicion to believe that his possession of the concealed firearm was unlawful. *See Lenoir*, 318 F.3d at 729 (quoting *United States v. Swift*, 220 F.3d 502, 506 (7th Cir. 2000)) ("Reasonable suspicion amounts to an 'objective manifestation that the person stopped is, or is about to be, engaged in criminal activity.'"). Generally speaking, Wisconsin citizens may lawfully carry a concealed weapon in public. *See* Wis. Const. art. I, § 25 ("The people have the right to keep and bear arms for security, defense, hunting, recreation or any other lawful purpose."); *see also* Wis. Stat. § 941.23(2)(d) (stating that Wisconsin's prohibition on carrying a concealed weapon does not apply to a licensee, as defined in Wis. Stat. § 175.60(1)(d)—that is "an individual holding a valid license to carry a concealed weapon"). And over 300,000 Wisconsin citizens have obtained a permit making it perfectly legal to carry a loaded handgun in a jacket pocket, as observed by Officer Beland here. *See* Wis. Dep't of Justice, Concealed Carry Annual Reports (2011–2016), https://www.doj.state.wi.us/dles/cib/conceal-carry/concealed-carry-annual-reports.

Officer Beland did not have any reason to believe that Mr. Winters was prohibited from carrying a concealed weapon. She did not know, for example, Mr. Winters's age or whether he was a convicted felon. Moreover, at the first evidentiary

---

[4] Officer Beland testified at the first evidentiary hearing that the object in Mr. Winters's jacket appeared notably heavier than a cell phone. Hr'g Tr. 71.

hearing, Officer Beland testified that, before telling Mr. Winters to stop and remain where he was, she asked if he had a firearm or a permit to carry a concealed weapon and he replied, "No." Hr'g Tr. 61. The Court relied on that sequence of events in determining that she had reasonable suspicion to stop and frisk Mr. Winters. *See* R & R 10–11, 14. Based on all the evidence received, however, the Court now concludes that Officer Beland directed Mr. Winters to stop *before* she inquired about the suspected firearm. *Compare* Hr'g Tr. 60–62 (first words were asking Mr. Winters whether he had a firearm or a CCW permit) *with* Suppl. Hr'g Tr. 15–17, 40–41, 58–60 (first words were "Hey dude," or something to that effect).

Officer Beland did not have any other particularized reason to believe that Mr. Winters was engaged in criminal activity. That the officers may have had reasonable suspicion to briefly detain Mr. Tyus to investigate the dropped firearm did not create an individualized suspicion with respect to Mr. Winters. Indeed, Mr. Tyus's conduct was perfectly lawful.

Moreover, Mr. Winters's own conduct did not create a particularized basis to believe that his possession of the firearm was unlawful. Footage from Officer Richards's body camera shows that it was Mr. Tyus (not Mr. Winters) who immediately walked across the street away from where he dropped the firearm. *See* Ex. 1002, "Subj Stop" at 0:00–0:09. While the officers approached, Mr. Winters took several slow steps toward the sidewalk; he did not suddenly change his direction or pace. The recording does not show him "blading" his body, performing a security check, or doing anything else suspicious. In fact, he was heading westbound as the

13

officers approached from the south, so his right side naturally was turned away from the officers.

Also, any belief that Mr. Winters was turning his body away from the officers to prevent them from noticing the firearm was dispelled by his subsequent actions. When Officer Beland was stopped in his path, Mr. Winters had his right side turned toward her. *See* Ex. 1, FI-5 at 0:01–0:12; *see also* Hr'g Tr. 72–73; Suppl. Hr'g Tr. 18–19, 46–47. Such conduct is inconsistent with someone attempting to conceal unlawful possession of a weapon in his right jacket pocket. And the officers did not provide any testimony regarding how Mr. Winters's behavior differed from someone who was lawfully carrying a firearm in his jacket pocket. *Compare United States v. Holmes*, Case No. 15-CR-129, 2016 U.S. Dist. LEXIS 18469, at *27–29 (E.D. Wis. Feb. 15, 2016) (finding seizure reasonable where officer "noted how defendant's behavior differed from what he usually sees with CCW permit holders").

Given the current legal landscape in Wisconsin, officers cannot automatically infer that an individual is committing a crime based solely on his carrying a firearm in public. *See United States v. Leo*, 792 F.3d 742, 752 (7th Cir. 2015); *Williams*, 731 F.3d at 693–94 (Hamilton, J., concurring). While the officers here reasonably believed that Mr. Winters had a firearm in his jacket, at the time he was seized they did not have reasonable suspicion to believe that such possession was unlawful. *See United States v. Black*, 707 F.3d 531, 540 (4th Cir. 2013) ("[W]here a state permits individuals to openly carry firearms, the exercise of this right, without more, cannot justify an investigatory detention. Permitting such a justification

14

would eviscerate Fourth Amendment protections for lawfully armed individuals in those states."); *United States v. Ubiles*, 224 F.3d 213, 217–19 (3d Cir. 2000) ("[A] mere allegation that a suspect possesses a firearm, as dangerous as firearms may be, [does not] justify an officer in stopping a suspect absent the reasonable suspicion required by Terry."); *United States v. Jones*, 606 F.3d 964, 968–69 (8th Cir. 2010) (Loken, C.J., concurring) ("[G]iving police officers unfettered discretion to stop and frisk anyone suspected of carrying a concealed weapon without some particularized suspicion of *unlawful* carrying conflicts with the spirit of the [Fourth] [A]mendment.").

Two final observations. The first is that the current legal landscape places police in a very difficult position. What are they to do when they see what is believed to be a concealed handgun, as Officer Beland accurately did here? It appears that one approach may be for an officer to ask, in a non-aggressive manner, whether the subject minds answering a few questions about whether he is lawfully carrying a firearm. Because without evidence that a concealed carry is unlawful, a *Terry* stop will likely not be justified.[5]

---

[5] This is not to say that an officer must always ask a person suspected of carrying a firearm whether he has a CCW permit before conducting a *Terry* stop. There may be other factors, not present here, indicating that carrying of a firearm is unlawful, such as evasive walking or conscious blading of the citizen's body (though it would not appear that security checks alone would indicate anything more than possession, as opposed to the requisite *unlawful* possession). *See, e.g., Holmes*, 2016 U.S. Dist. LEXIS 18469, at *27–29 (finding seizure reasonable where defendant "turn[ed] away quickly on seeing the police, move[d] away at an accelerating pace, ignore[d] commands to stop, and [held] his hands by his waistband as if trying to conceal the gun").

15

Second, because the government has the burden to justify a *Terry* stop, it becomes critical that police officers have their body cameras operating throughout an encounter with a suspect. As cases like *Smith* show, tone and approach matter, and uncertainty as to either tends to undercut support for a *Terry* stop. Here, the ability of the government to justify the stop of Mr. Winters was made far more difficult because Officer Beland, alone among the other officers, failed to operate her body camera. This Court's experience is that the vast majority of law enforcement officers are incredibly professional in their encounters with their fellow citizens. Body-cam footage is thus a vital tool to vindicate their conduct. Absent its use, uncertainty will rarely justify a *Terry* stop.

### IV. Conclusion

Accordingly, for all the foregoing reasons, the Court will vacate its initial report and recommendation and will recommend that Judge Stadtmueller grant Mr. Winters's suppression motion.

**NOW, THEREFORE, IT IS HEREBY ORDERED** that this Court's Recommendation on Defendant's Motion to Suppress, ECF No. 23, is **VACATED**.

**NOW, THEREFORE, IT IS HEREBY RECOMMENDED** that defendant Terrell L. Winters's Motion to Suppress Evidence, ECF No. 14, be **GRANTED**.

---

Additionally, an officer advised that a person with glasses wearing a blue shirt just committed a robbery with a handgun would be permitted to conduct a *Terry* stop of a person with glasses wearing a blue shirt who appeared to have handgun concealed in his waistband, because possession of a handgun was an identifier of a criminal suspect, but not because possession of the handgun itself was unlawful.

Your attention is directed to 28 U.S.C. § 636(b)(1)(A), (B), and (C), Fed. R. Crim. P. 59(a) and (b)(2), and E.D. Wis. Gen. L. R. 72(c), whereby written objections to any order or recommendation herein, or part thereof, may be filed within fourteen days of the date of service of this supplemental recommendation. Objections are to be filed in accordance with the Eastern District of Wisconsin's electronic case filing procedures. Failure to file a timely objection with the District Judge shall result in a waiver of a party's right to appeal. If no response or reply will be filed, please notify the Court in writing.

Dated at Milwaukee, Wisconsin, this <u>26th</u> day of April, 2017.

**BY THE COURT:**

<u>*s/ David E. Jones*</u>
DAVID E. JONES
United States Magistrate Judge