# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF WISCONSIN

UNITED STATES OF AMERICA,

              Plaintiff,

v.

TERRELL L. WINTERS,

              Defendant.

Case No. 16-CR-146-JPS

**ORDER**

## 1. INTRODUCTION

Defendant was indicted in September 2016 for being a felon in possession of a firearm. (Docket #1). On November 17, 2016, he filed a motion to suppress the police's recovery of the firearm from his person, arguing that they lacked reasonable suspicion that he was engaged in criminal activity. (Docket #14). As described more fully below, this motion has been subject to extensive briefing, evidentiary hearings, and court findings. Magistrate Judge David E. Jones' latest recommendation to this Court is to grant Defendant's motion. (Docket #45). The government objected to that recommendation. (Docket #47). For the reasons explained below, the Court will overrule the government's objection, adopt Magistrate Jones' recommendation, and grant the motion to suppress.

## 2. RELEVANT FACTS

The government's objection takes no issue with Magistrate Jones' factual findings. *See generally* (Docket #47). This Court will therefore adopt them in their entirety, and will briefly review them here. (Docket #45 at 3-4). Defendant and Robi Tyus ("Tyus") stood in the street as police officers, including Sarah Beland ("Beland"), were on a bicycle patrol. Tyus dropped

a gun which clattered on the pavement. Officers turned their attention to Tyus and made contact with him, discussing whose gun it was and whether it was lawfully possessed.[1] Defendant, meanwhile, began to walk across the street, away from the assembled group. Beland moved into Defendant's path with her bicycle. As she approached, Beland observed a heavy bulge in Defendant's jacket which she believed was a firearm. Once in front of Defendant, Beland told him to stop. When Defendant continued to move forward, albeit slowly, another officer grabbed him from behind. Once Defendant was handcuffed, the officers retrieved a gun from his jacket pocket, as well as drugs and cash. Defendant was charged with being a felon in possession of a firearm. (Docket #1).

3.   **PROCEDURAL BACKGROUND**

Magistrate Jones initially recommended that Defendant's motion be denied. (Docket #23). To arrive at that conclusion, Magistrate Jones first found that: 1) Defendant was seized when Beland told him to stop, and 2) Beland and her fellow officers' prior observations established reasonable suspicion that he was illegally carrying a firearm. *Id.* at 8-16. Magistrate Jones further found that the officers' resultant frisk was reasonable and that the government failed to prove that the gun would have inevitably been discovered (though this, of course, did not alter the outcome of the recommendation).

Defendant objected to the first recommendation. (Docket #25). In addressing his objection, this Court noted that he raised new arguments therein. (Docket #30). Before Magistrate Jones, Defendant maintained that

---

[1]In fact, Tyus had a valid concealed carry permit. (Docket #45 at 3).

he was seized as of the time Beland told him to stop, and Magistrate Jones agreed. Before this Court, Defendant moved the time of seizure backward, to the point at which Beland moved in front of him while she was on her bicycle. (Docket #30 at 1-2). Because Defendant did not present that contention to Magistrate Jones, and it was potentially dispositive of the motion, this Court remanded the matter to Magistrate Jones to address that narrow issue. *Id.* at 3.

After further hearings and briefing, Magistrate Jones issued a new recommendation. (Docket #45). Magistrate Jones determined that Defendant was not seized at any point prior to Beland's first words to him, confirming his finding in the first recommendation. *Id.* at 6-10. Also in line with the first recommendation, Magistrate Jones found that Beland could have reasonably suspected that Defendant had a gun concealed in his jacket. *Id.* at 11-12. Magistrate Jones then deviated from the first recommendation by finding that Beland had no reason to suspect that Defendant's gun possession was unlawful. *Id.* at 12. Specifically, Magistrate Jones found that Beland lacked reasonable suspicion that Defendant was not permitted to carry a concealed firearm. *Id.* at 12-15.

The government timely objected to Magistrate Jones' second recommendation. (Docket #47). Defendant responded to the objection, and the government declined to offer a reply. (Docket #48). As explained below, the Court concurs with Magistrate Jones' analysis in his second recommendation.

4. **STANDARD OF REVIEW**

When reviewing a magistrate's recommendation, the Court is obliged to analyze the recommendation *de novo*. 28 U.S.C. § 636(b)(1)(C). Thus, the Court can "accept, reject, or modify, in whole or in part, the

findings or recommendations made by the magistrate." *Id.* In other words, the Court's *de novo* review of Magistrate Jones' findings and recommendations is not limited to his legal analysis alone; rather, the Court may also review his factual findings, and accept, reject, or modify those findings as it sees fit based upon the evidence. *Id.*

5. **ANALYSIS**

This time, Defendant did not submit an objection to the determination as to the timing of seizure.[2] Thus, all parties are in agreement that Defendant was seized when Beland told him to stop. As of the moment of seizure, Defendant's Fourth Amendment rights required that Beland have reasonable suspicion, based on "some objective manifestation," that Defendant "is, or is about to be, engaged in criminal activity." *United States v. Swift*, 220 F.3d 502, 506 (7th Cir. 2000); *Terry v. Ohio*, 392 U.S. 1 (1968). The parties further agree that Beland, given her observation of the bulge in Defendant's jacket, had reasonable suspicion that Defendant was carrying a firearm as of the time she seized him. They are before this Court again because they do not agree on whether Beland could reasonably suspect that Defendant's gun possession was unlawful.

Again, Magistrate Jones found that she could not, for two reasons. *See* (Docket #45 at 10-16). First, Wisconsin law permits citizens to carry concealed firearms in public. *See* Wis. Const. art. I, § 25 ("The people have the right to keep and bear arms for security, defense, hunting, recreation or any other lawful purpose."); *see also* Wis. Stat. §§ 175.60, 941.23(2)(d)

---

[2]Defendant's response to the government's objection references the fact that the Court's review is *de novo*, and thus it could go back and reconsider the seizure timing issue. (Docket #48 at 12). The Court will not do so without an actual objection from Defendant submitted in accordance with the rules governing magistrate judge recommendations. *See* (Docket #45 at 17).

(carrying a concealed firearm is a misdemeanor except for, *inter alia*, those holding a concealed carry permit). Numerous Wisconsin citizens have concealed carry permits. *See* Wis. Dep't of Justice, Concealed Carry Annual Reports (2011–2016), https://www.doj.state.wi.us/dles/cib/conceal-carry/concealed-carry-annual-reports; Katie Delong, *300,000th Concealed Carry Permit Issued in WI; More Than 19K Applications Processed This Year*, Fox6 Now, Mar. 31, 2016, *available at* http://fox6now.com/2016/03/31/300000th-concealed-carry-permit-issued-in-wisconsin-more-than-19000-applications-processed-this-year. In light of Wisconsin's approach to gun ownership, Beland and the other officers could not take Defendant's concealed gun possession as establishing reasonable suspicion of criminal activity. Beland thus had no general basis to believe that Defendant's mere act of carrying a concealed firearm was criminal.

Second, Beland had no particularized suspicion that Defendant was not permitted to have a concealed weapon. The fact that his companion dropped a gun supplied no suspicion of criminal activity as to Defendant. Further, Defendant's own conduct did not create any suspicion of unlawful gun possession. He simply walked away from his friend and the group of police officers talking to him. When Beland stopped him, Defendant did not attempt to hide the bulge in his jacket. Magistrate Jones noted that the government failed to show how Defendant's behavior was unique to someone who was unlawfully carrying a firearm, as opposed to properly licensed gun owners.[3]

---

[3]Magistrate Jones made two factual findings in arriving at his conclusion that Beland lacked a particularized reason to suspect unlawful gun possession. First, despite some inconsistent testimony, Magistrate Jones found that Beland told Defendant to stop prior to asking whether he had a concealed carry permit. (Docket #45 at 13). Second, Magistrate Jones held that Defendant's movements and

Without any reasonable suspicion that Defendant had done something illegal by concealing a gun in his pocket, Magistrate Jones concluded that Beland's seizure violated the Fourth Amendment. The government presents one primary objection to Magistrate Jones' recommendation. It contends that the Wisconsin laws cited above make concealed gun ownership a crime *unless* the possessor has a permit to do so. The Wisconsin Supreme Court and the state's pattern jury instructions establish licensure as an affirmative defense to the crime of bearing a concealed weapon. *See State v. Hamdan*, 665 N.W.2d 785, 813 (Wis. 2003); Wis. Jury Inst. – Criminal §§ 1335, 1335A, 1335B. In the government's view, police can assume that concealed firearm possession is unlawful, so that any time they observe such conduct, a reasonable suspicion of criminal activity arises. Wisconsin law places a duty on the bearer of a concealed weapon to show officers his identification and concealed carry permit. Wis. Stat. § 175.60(2g)(c). Once done, the officer's *Terry* stop would be complete and no Fourth Amendment violation would occur.

The Court concurs with Magistrate Jones, not the government. Beland had no reason to believe that Defendant had committed any crime upon observing the jacket bulge. Both the United States and Wisconsin constitutions secure the rights of Wisconsin citizens to carry firearms. While Wisconsin is permitted to enact appropriate restrictions on gun ownership and possession, those are exceptions to that fundamental right. More importantly, the government's position reverses *Terry* and the Fourth

---

behavior did not raise any inference that he was attempting to hide criminal conduct. *Id.* at 13-14. Again, the government did not object to these factual findings, and the Court sees no reason to disagree with Magistrate Jones on either determination.

Amendment's reasonableness requirement. Even if Wisconsin wanted to establish the duties and burdens described by the government, it could not contradict the right against unreasonable seizures guaranteed by the United States Constitution.[4]

The Courts of Appeal disagree on this point. Some hold that a jurisdiction's legalization of gun possession, including concealed possession, eliminates those facts as a sufficient and independent basis for reasonable suspicion to satisfy the Fourth Amendment. *United States v. Jones*, 606 F.3d 964, 968-69 (8th Cir. 2010) (Loken, C.J., concurring) ("[G]iving police officers unfettered discretion to stop and frisk anyone suspected of carrying a concealed weapon without some particularized suspicion of unlawful carrying conflicts with the spirit of the [Nebraska constitutional] amendment. It is also contrary to a basic purpose of the Fourth Amendment's reasonableness standard—to protect citizens from the unconstrained exercise of discretion.") (quotation omitted); *United*

---

[4]As Defendant notes, it is not clear that Wisconsin actually intended to interfere with the Fourth Amendment. Wisconsin has codified the *Terry* standard as part of its code of criminal procedure. Wis. Stat. § 968.24. The licensure statute cited by the government only allows officers to stop someone to check their license when it would otherwise be lawful to do so:

> [U]pon request by a law enforcement officer who is acting in an official capacity *and with lawful authority*, a licensee who is carrying a concealed weapon shall display to the officer his or her license document [and] photographic identification[.]

*Id.* § 175.60(2g)(c) (emphasis added). Even violating this rule is not a crime, but merely imposes a forfeiture. *Id.* § 175.60(a) (assessing $25 fine for violating (2g)); *id.* § 939.12 ("Conduct punishable only by a forfeiture is not a crime."). In light of the language of the licensure statute and Wisconsin's reference to the *Terry* rule, it does not follow that the duty to produce a license to police creates an automatic excuse to seize anyone carrying a concealed firearm.

*States v. Ubiles*, 224 F.3d 213, 217-18 (3d Cir. 2000); *United States v. Black*, 707 F.3d 531, 540 (4th Cir. 2013); *Northrup v. City of Toledo Police Dep't*, 785 F.3d 1128, 1131-33 (6th Cir. 2015). Others find that observing a gun can support a valid *Terry* stop when the jurisdiction makes licensure an affirmative defense, holding that a stop can be used to resolve an ambiguity on the legality of an individual's gun possession. *United States v. Lewis*, 674 F.3d 1298, 1304-05 (11th Cir. 2012); *United States v. Briggs*, 720 F.3d 1281, 1287-88 (10th Cir. 2013); *United States v. Gatlin*, 613 F.3d 374, 378-79 (3d Cir. 2010) (distinguished from the Third Circuit's *Ubiles* decision because Delaware, unlike the Virgin Islands, presumes that carrying a concealed firearm is illegal).

Though the Seventh Circuit has not decided this issue, its recent *Leo* opinion reveals that it would likely follow the Fourth, Sixth, and Eighth Circuits. Leo was stopped by police on suspicion that he had committed burglary using a gun. *United States v. Leo*, 792 F.3d 742, 744 (7th Cir. 2015). He was patted down and no gun was found. *Id.* at 745. Immediately thereafter, without saying anything else, the officer opened Leo's backpack (which was on the ground near him) and found a gun. *Id.* The police later learned that Leo was not involved in the burglary, but he was charged with a crime anyway—being a felon in possession of a firearm. *Id.* Leo moved to suppress the gun because the officer's *Terry* stop did not entitle the police to search his backpack. *Id.* The lower court denied the motion. *Id.* at 746-47. Leo appealed, and the only argument the government presented on appeal was that the search was justified by *Terry*. *Id.* at 748-49. The Court of Appeals disagreed, concluding that the backpack search went beyond the "pat-down" contemplated by *Terry*, and that officers cannot use

information discovered in an improper *Terry* search to create a post-hoc justification for the search. *Id.* at 749-52.

The government is correct to note that the facts of *Leo* are not analogous to this case. Further, the issues are different; Magistrate Jones' recommendation addresses Defendant's seizure, not the subsequent search. However, the Court of Appeals closed with insight on its views of Leo's right to carry his gun:

> [W]e note that the Supreme Court has made clear that the Second Amendment protects the individual right to keep and bear arms, *see District of Columbia v. Heller*, 554 U.S. 570, 635–36 . . . (2008), and applies equally to the states through the Fourteenth Amendment, *see McDonald v. City of Chicago*, 561 U.S. 742, 791 . . . (2010). And we have held that, subject to reasonable restrictions, the Second Amendment protects the right to carry a gun in public. *See Moore v. Madigan*, 702 F.3d 933, 942 (7th Cir. 2012). Considering these important developments in Second Amendment law together with Wisconsin's gun laws, we cannot accept the government's contention that the possibility of a gun in Leo's backpack posed a unique threat that justified a full search of the bag on less than probable cause. *See United States v. Williams*, 731 F.3d 678, 694 (7th Cir. 2013) (Hamilton, J., concurring in part and concurring in judgment) ("After *Heller* and *McDonald*, all of us involved in law enforcement, including judges, prosecutors, defense attorneys, and police officers, will need to reevaluate our thinking about these Fourth Amendment issues and how private possession of firearms figures into our thinking.").

*Id.* at 752. To the Court, this passage indicates that the Seventh Circuit would concur with *Jones*, *Ubiles*, *Black*, and *Northrup*. Given this observation, the persuasive value of those cases, and the lack of controlling authority in this Circuit, the Court finds that Defendant's seizure violated the Fourth Amendment. Beland's only basis for reasonable suspicion—the

assumption that Defendant's concealed firearm possession was illegal—was invalid.

To explain this ruling another way, the Court finds apposite the analogies raised in *Ubiles* and in Defendant's brief. The Third Circuit noted that while possessing a wallet is of course legal, wallets may contain counterfeit currency, which is illegal across the nation. *Ubiles*, 224 F.3d at 218. That possibility does not entitle police to stop anyone suspected of carrying a wallet to check for counterfeit money, because wallet possession does not raise a suspicion of ongoing or imminent illegal activity. *Id.* Likewise, Defendant points to a common instance of licensed conduct—driving. Driving without a license is unlawful, but this fact does not permit police to stop any and all vehicles on the road simply to check for valid licenses. (Docket #48 at 3, 7). As Defendant puts it, "observing licensable conduct without reasonable suspicion of non-licensure does not create reasonable suspicion of crime." *Id.* at 3.

As noted by Magistrate Jones, this ruling may appear to place police in a difficult position when dealing citizens whom they believe are carrying concealed weapons. The protections of the Fourth Amendment can, and in this case do, override the needs of law enforcement. Generally, this means that police should attempt a consensual encounter with a suspected concealed carrier prior to initiating a *Terry* stop.[5] Critically, however, police

---

[5]The *Jones* court explained the issue another way:

> We do not underestimate the importance of ferreting out violent offenders who unlawfully carry firearms in public, and the value of protective frisks in guarding the safety of law enforcement officers and others who may be in harm's way. But as we noted [previously], being stopped and frisked on the street is a substantial invasion of an individual's interest to be free from arbitrary

Page 10 of 13

need not be sure that the suspect is carrying a firearm illegally in order to move forward with a *Terry* stop. All that is required is some indication of criminal activity, and the gun's presence, whether or not carried lawfully, may factor in to that assessment. In Beland's case, she could have opened her conversation with Defendant by asking about his gun and whether he had a license to carry it. If he answered "no," gave an evasive response, or demonstrated other indicators of criminal conduct, including the "blading" and "security checks" discussed by Magistrate Jones, those could all form the basis of reasonable suspicion supporting a *Terry* stop. *See* (Docket #45 at 13-14).[6]

---

> interference by police, and the police have less invasive options for identifying the perpetrators of crime. Most obviously, Officer Hasiak could have initiated a consensual encounter, for which no articulable suspicion is required, and which may both crystallize previously unconfirmed suspicions of criminal activity and give rise to legitimate concerns for officer safety.

*Jones*, 606 F.3d at 968 (citations and quotations omitted).

[6]The difference between a *Terry* stop and a *Terry* frisk, noted above in discussing *Leo*, provides a useful contrast here. A stop requires reasonable suspicion of criminal activity, while a frisk is justified when a person is lawfully stopped and police suspect that the person is armed and dangerous. *United States v. Robinson*, 846 F.3d 694, 698 (4th Cir. 2017). Robinson conceded that he was properly stopped by police (as part of a traffic stop) and that they knew he was armed. *Id.* at 697-98. He argued, nevertheless, that officers had no reason to believe he was dangerous because he was lawfully carrying his gun. *Id.* at 698. The court disagreed, finding that Robinson attempted to conflate the stop standard with the frisk standard. *Id.* A frisk is not concerned with illegal conduct, but rather with public and officer safety. *Id.* The court found that even those permitted to carry a firearm may be required to submit to a *Terry* frisk so long as they were otherwise lawfully subjected to a *Terry* stop. *Id.* at 700-01.

    The *Robinson* dissent took issue with this holding, claiming that it impermissibly created a rule of *per se* dangerousness for anyone carrying a firearm. *Id.* at 707 (Harris, J., dissenting). The dissent referenced the Fourth Circuit's *Black* opinion, as well as those from other Courts of Appeal, which recognize that "when

6.  **CONCLUSION**

The government bore the burden to demonstrate that reasonable suspicion supported Beland's seizure of Defendant. It failed to carry that burden.[7] The Court will, therefore, overrule the government's objection, (Docket #47), adopt the second recommendation of Magistrate Jones, (Docket #45), and grant Defendant's motion to suppress, (Docket #14).

Accordingly,

**IT IS ORDERED** that Magistrate Judge David E. Jones' April 26, 2017 Report and Recommendation (Docket #45) be and the same is hereby **ADOPTED**, and that the government's objection thereto (Docket #47) be and the same is hereby **OVERRULED**; and

**IT IS FURTHER ORDERED** that Defendant's motion to suppress (Docket #14) be and the same is hereby **GRANTED**.

---

a state elects to legalize the public to carry firearms, . . . the Fourth Amendment equation changes, and public possession of a gun is no longer 'suspicious' in a way that would authorize a *Terry* stop." *Id.* at 708 (Harris, J., dissenting) (citing *Leo*, 792 F.3d at 749-52; *Ublies*, 224 F.3d at 218; *Northrup*, 785 F.3d at 1131-33). As applied to our case, *Robinson*'s holdings mean that Beland could have frisked Defendant if he had otherwise been lawfully stopped. Because her only basis for suspecting criminal activity was the mere presence of a concealed gun, however, even the *Robinson* court would agree that her stop was unlawful.

[7] The government never objected to Magistrate Jones' finding that it failed to prove that the gun would inevitably have been discovered. *See* (Docket #23 at 18-19 and Docket #26). The government has thus waived the issue and the Court will not analyze it *sua sponte* in an attempt to save the government's case. *See Leo*, 792 F.3d at 749 ("As we often warn litigants, it is not our responsibility to make the parties' arguments for them.").

Dated at Milwaukee, Wisconsin, this 22nd day of June, 2017.

BY THE COURT:

_____
J. P. Stadtmueller
U.S. District Judge